PATSY MICHAEL, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF DAVID GWEAN MICHAEL, DECEASED; AND MEREDITH T. MICHAEL, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF CHRISTOPHER ROBERT MICHAEL, DECEASED; PLAINTIFFS v. HUFFMAN OIL COMPANY, INC.; CITY OF BURLINGTON, NORTH CAROLINA; ARCADIS FPS, INC., FORMERLY DOING BUSINESS AS FINKBEINER, PETTIS & STROUT, INC.; AND PAUL HOWARD CONSTRUCTION COMPANY, INC.; DEFENDANTS

No. COA07-1293

(Filed 6 May 2008)

**1. Appeal and Error— appealability—partial summary judgment—substantial right affected**

An appeal from a summary judgment for fewer than all of the defendants affected a substantial right and was heard where there were complex facts and the possibility of inconsistent verdicts.

**2. Negligence— engineers—standard of care**

The trial court did not abuse its discretion by excluding expert testimony about the standard of care applicable to professional engineers in a case that began with the deaths of two workers in an underground vault during construction of a waterline. The expert opinion was based solely on a methodology that has been found insufficient to establish the standard of care applicable to professional engineers.

**3. Negligence— construction of waterline—not inherently dangerous**

Workers who were killed in an underground vault during the installation of a waterline were not engaged in an inherently dangerous activity. They were not engaged in "trenching," and a supervisor stated that he had never in his twenty-two years in the field heard of anyone dying during construction of waterlines (as opposed to sewer mains). The trial court properly granted summary judgment for the City of Burlington on this issue.

**4. Negligence— deaths during construction of waterline—no hazardous substance involvement**

The trial court properly granted summary judgment for the City of Burlington on plaintiffs' claim that the City violated N.C.G.S. § 143-215.93 (control over oil or other hazardous substances) during construction of a waterline. The City was at no time "using, transferring, storing, or transporting oil or other hazardous substances" through its easement.

MICHAEL v. HUFFMAN OIL CO.

[190 N.C. App. 256 (2008)]

**5. Contracts— indemnity provision for costs—not applicable to damages for personal injury**

The trial court did not err by ruling that plaintiffs were not entitled to recover direct damages from the City of Burlington for the deaths of workers based upon indemnity language in a contract. The contract required the City to reimburse the decedents for certain claims, but plaintiffs were attempting to collect payment of direct damages for personal injury rather than to be indemnified.

**6. Negligence— engineers—evidence of standard of care—properly excluded**

Plaintiffs could not make a prima facie showing of professional negligence by an engineer where their expert testimony about the standard of care was properly excluded.

**7. Negligence— misrepresentation—traditional negligence rules—standard of care**

Even though one of the claims arising from deaths during a waterline installation was labeled negligent misrepresentation, it was based upon traditional negligence rules, and plaintiffs did not present evidence of the applicable standard of care. Summary judgment was properly granted for defendant city and its engineering firm.

**8. Premises Liability— waterline construction—premises liability—standard of care—expert testimony required**

Summary judgment was properly granted for defendants on a premises liability claim in an action arising from deaths during a waterline construction project. Based upon the complexity of facts, expert testimony was required to establish the standard of care, but plaintiffs failed to present that testimony.

Appeal by plaintiffs from orders entered 18 January, 4 April, 1 May and 2 May 2007 by Judge John O. Craig, III in Guilford County Superior Court. Heard in the Court of Appeals 2 April 2008.

*Conner, Gwyn, Schenck, P.L.L.C., by C. Hamilton Jarrett, for plaintiff-appellants.*

*Cranfill, Sumner & Hartzog, L.L.P., by Patrick H. Flanagan, Ryan D. Bolick and Melody J. Canady, for defendant-appellee City of Burlington, North Carolina.*

MICHAEL v. HUFFMAN OIL CO.

[190 N.C. App. 256 (2008)]

*Parker, Poe, Adams & Bernstein, L.L.P., by Thomas N. Griffin, III and John E. Grupp, for defendant-appellee Arcadis FPS, Inc.*

*No brief was submitted by defendants Huffman Oil Company, Inc. or Paul Howard Construction Company.*

TYSON, Judge.

Patsy Michael and Meredith T. Michael (collectively, "plaintiffs"), both individually and as Administrators of the Estates of David Gwean Michael and Christopher Robert Michael, respectively, appeal from orders: (1) excluding expert testimony by plaintiffs' witness, Dr. Wu-Seng Lung, Ph.D., P.E. ("Dr. Lung") regarding the standard of care applicable to Arcadis FPS, Inc. ("Arcadis") and the City of Burlington, North Carolina ("City of Burlington"); (2) granting partial summary judgment in favor of the City of Burlington on plaintiffs' Chapter 143 and negligent misrepresentation claims; (3) granting summary judgment in favor of Arcadis on all of plaintiffs' claims; and (4) subsequently granting summary judgment in favor of the City of Burlington on all of plaintiffs' remaining claims. We affirm.

## I. Background

On 10 July 2002, the City of Burlington purchased an easement from Huffman Oil Company, Inc. ("Huffman") to construct and maintain a waterline under and across Huffman's property near the corner of U.S. Highway 70 and N.C. Highway 100 in Guilford County. In 2003, the City of Burlington began construction of approximately 12,300 linear feet of 24-inch potable waterline to connect the City of Burlington's water system to the City of Greensboro's water system ("the water main project").

Arcadis was retained to provide engineering and surveying services for the project. Paul Howard Construction Company, Inc. ("Howard") was hired to perform the required construction work. Howard entered into a sub-contract with PDM Investments, Inc. ("PDM") to install a series of underground vaults to house and provide access to valves at specified locations along the waterline.

David and Christopher Michael ("the Michaels") of Michael's Backhoe & Landscaping, Inc. were sub-contracted to construct part of the waterline on behalf of PDM. The Michaels were contractually responsible for all excavation, pipe installation, fittings and valve installation, compacting, erosion control measures, and testing from Station 0+00 to Station 48+00.

## MICHAEL v. HUFFMAN OIL CO.

[190 N.C. App. 256 (2008)]

On 3 July 2003, after completing the majority of the required work, the Michaels performed a pressure test on a portion of the waterline recently installed. This test required access through the underground vault installed by PDM and Howard, near the intersection of Highways 70 and 100. The waterline failed to maintain sufficient pressure for the required period of time. The Michaels dismissed the remainder of their crew and proceeded to search for the leak. The next morning, the Michaels were found dead at the bottom of the vault.

The cause of death was determined to be "asphyxia and environmental hypoxia" due to a hazardous and toxic environment and petroleum discharge. The medical examiner found that the cause of death was "consistent with the extremely low oxygen levels in the vault measured shortly after the bodies of [the Micheals] were removed."

On 6 June 2005, plaintiffs filed a complaint alleging fourteen separate wrongful death claims against Huffman, the City of Burlington, Arcadis, and Howard. Plaintiffs contended that the deaths were caused by hazardous environmental conditions existing near the corner of Highways 100 and 70. Plaintiffs alleged the hazardous environmental condition resulted from toxic vapors leaking into the soil from two underground storage tanks used in connection with a gasoline service station that formerly operated on Huffman's property.

Plaintiffs alleged the following claims for relief against the City of Burlington: (1) strict liability under a violation of Chapter 143; (2) third-party beneficiary; (3) failure to investigate; (4) failure to warn; (5) negligent misrepresentation; (6) inherently dangerous work; and (7) premises liability. Plaintiffs alleged negligence and negligent misrepresentation against Arcadis. Subsequently, both the City of Burlington and Arcadis filed answers, which denied plaintiffs' material allegations and asserted the affirmative defense of contributory negligence. On 13 December 2006, Arcadis filed a motion to exclude plaintiffs' expert witness, Dr. Lung, and moved for summary judgment on all claims.

On 21 December 2006, the City of Burlington moved for partial summary judgment regarding the following claims: (1) third-party beneficiary; (2) failure to investigate; (3) failure to warn; (4) negligent misrepresentation; (5) inherently dangerous work; and (6) premises liability. On 20 February 2007, the City of Burlington filed: (1) a second motion for partial summary judgment regarding plaintiffs' claim

for strict liability under Chapter 143 and (2) a motion to exclude Dr. Lung's expert testimony.

By separate orders dated 18 January and 4 April 2007, the trial court ruled that Dr. Lung would not be permitted to testify at trial as to the appropriate standard of care or the breach of such standard regarding defendants, Arcadis and the City of Burlington. On 4 April 2007, the trial court also granted partial summary judgment in favor of the City of Burlington regarding plaintiffs' claims of: (1) strict liability under violation of Chapter 143 and (2) negligent misrepresentation.

On 2 May 2007, the trial court granted summary judgment in favor of Arcadis on all of plaintiffs' claims. The trial court also granted summary judgment in favor of the City of Burlington on all of plaintiffs' remaining claims. On 29 May and 15 June 2007, the trial court issued orders staying the remaining proceedings pending resolution of this appeal. Plaintiffs appeal.

## II. Issues

Plaintiffs argue the trial court erred by: (1) granting Arcadis's and the City of Burlington's motions to exclude Dr. Lung's expert testimony; (2) granting partial summary judgment in favor of the City of Burlington regarding plaintiffs' Chapter 143 and negligent misrepresentation claims; (3) granting summary judgment in favor of Arcadis regarding all of plaintiffs' claims; and (4) subsequently granting summary judgment in favor of the City of Burlington regarding all of plaintiffs' remaining claims.

## III. Interlocutory Appeal

[1] As a preliminary matter, this appeal is interlocutory. "Generally, a party cannot immediately appeal from an interlocutory order unless failure to grant immediate review would affect[] a substantial right pursuant to N.C.G.S. sections 1-277 and 7A-27(d)." *Davis v. Davis*, 360 N.C. 518, 524, 631 S.E.2d 114, 119 (2006) (internal citations and quotations omitted). In cases where there are complex facts and a possibility of inconsistent verdicts in separate trials, an order allowing summary judgment as to fewer than all defendants affects a substantial right. *Federal Land Bank v. Lieben*, 86 N.C. App. 342, 344, 357 S.E.2d 700, 702 (1987). As this is true of the case *sub judice*, we review the merits of plaintiffs' appeal.

### IV. Exclusion of Expert Testimony

Plaintiffs argue Dr. Lung should be allowed to testify as an expert witness in this case and opine the standard of care to be employed by professional engineers in the design and administration of underground utility construction projects. We disagree.

### A. Standard of Review

It is well-established that trial courts must decide preliminary questions concerning the qualifications of experts to testify or the admissibility of expert testimony. When making such determinations, trial courts are not bound by the rules of evidence. In this capacity, trial courts are afforded wide latitude of discretion when making a determination about the admissibility of expert testimony. Given such latitude, it follows that *a trial court's ruling on the qualifications of an expert or the admissibility of an expert's opinion will not be reversed on appeal absent a showing of abuse of discretion.*

*Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004) (internal quotations and citations omitted) (emphasis supplied).

### B. Analysis

[2] North Carolina has adopted a three-part test in determining the admissibility of expert testimony: "(1) Is the expert's proffered method of proof sufficiently reliable as an area for expert testimony? (2) Is the witness testifying at trial qualified as an expert in that area of testimony? [and] (3) Is the expert's testimony relevant?" *Id.* (citing *State v. Goode*, 341 N.C. 513, 527-29, 461 S.E.2d 631, 639-41 (1995)).

Here, the trial court separately considered Arcadis's and the City of Burlington's motions to exclude Dr. Lung's expert testimony. In its order excluding Dr. Lung's testimony concerning the standard of care applicable to Arcadis, it applied the three-part test enunciated in *Howerton* and concluded, *inter alia*:

Dr. Lung's testimony regarding the standard of care applicable to [Arcadis] and any breach of the standard of care by [Arcadis] is not admissible and should be excluded . . . . Specifically (1) Dr. Lung is not qualified to express opinions regarding the standard of care applicable to the design of a water main construction project by North Carolina professional engineers, (2) Dr. Lung's testimony is not relevant to the claims asserted against [Arcadis],

and (3) Dr. Lung's method of proof is not sufficiently reliable as an area for expert testimony.

The trial court further stated, "This Order is not intended to and shall not affect the ability of Dr. Lung from testifying at the trial of this lawsuit regarding matters other than the standard of care applicable to [Arcadis] or any breach of the applicable standard of care by [Arcadis]." In a less extensive order, the trial court concluded that the same rationale applied to Dr. Lung's testimony regarding the standard of care applicable to the City of Burlington.

As a threshold issue, the trial court is required to "determine whether the expert's method of proof is sufficiently reliable as an area for expert testimony." *Id.* at 459, 597 S.E.2d at 686 (citation omitted). In *Howerton*, our Supreme Court stated:

> [T]o determine whether an expert's area of testimony is considered sufficiently reliable, a court may look to testimony by an expert specifically relating to the reliability, may take judicial notice, or may use a combination of the two. Initially, the trial court should look to precedent for guidance in determining whether the theoretical or technical methodology underlying an expert's opinion is reliable. Although North Carolina does not exclusively adhere to the *Frye* general acceptance test, when specific precedent justifies recognition of an established scientific theory or technique advanced by an expert, the trial court should favor its admissibility, provided the other requirements of admissibility are likewise satisfied. . . . Conversely, there are those scientific theories and techniques that have been recognized by this Court as inherently unreliable and thus generally inadmissible as evidence.

*Id.* at 459-60, 597 S.E.2d at 687 (internal citations and quotations omitted).

In cases where the trial court is without precedential guidance to determine whether the expert's proffered scientific or technical method of proof is sufficiently reliable, it should focus on the non-exclusive "indices of reliability" including: "the expert's use of established techniques, the expert's professional background in the field, the use of visual aids before the jury so that the jury is not asked to sacrifice its independence by accepting [the] scientific hypotheses on faith, and independent research conducted by the expert." *Id.* at 460, 597 S.E.2d at 687 (alteration original) (citation and quotation omitted).

## MICHAEL v. HUFFMAN OIL CO.

[190 N.C. App. 256 (2008)]

The dispositive issue before us is whether plaintiffs have shown an abuse of discretion in the trial court's ruling that Dr. Lung's use of a code of ethics for engineers is an unreliable methodology for determining the standard of care applicable to the defendants at bar.

This Court addressed a similar issue in *Associated Indus. Contr'rs, Inc. v. Fleming Eng'g, Inc.*, 162 N.C. App. 405, 413, 590 S.E.2d 866, 872 (2004), *aff'd*, 359 N.C. 296, 608 S.E.2d 757 (2005). In *Fleming*, the defendant challenged the trial court's findings of fact, which took judicial notice of various statutes relating to the practice of engineering and land surveying. *Id.* Specifically, the defendant challenged the following finding of fact:

4. Under N.C.G.S. § 89C-3 and 89C-2, the Defendant, as a regulated professional engineer and surveyor, had a legal duty to safeguard the property of the public. In this case, the Defendant was to render its services in a professional adequate and workmanlike manner, in light of Plaintiff's evidence that its employees did not feel competent in performing the work themselves. *The Court finds that the Defendant failed to meet its legal duty and failed to meet the standard of care created by N.C.G.S. § 89C-2 and N.C.G.S. § 89C-3.*

*Id.* (emphasis supplied). This Court subsequently concluded, "[t]o the extent that Finding of Fact 4 suggests that N.C. Gen. Stat. §§ 89C-2, -3 (2003) creates a specific standard of care, we agree with Fleming that *the trial court erred in relying on those statutes.*" *Id.* (emphasis supplied).

N.C. Gen. Stat. § 89C-2 (2003) provides:

*In order to safeguard life, health, and property, and to promote the public welfare, the practice of engineering and the practice of land surveying in this State are hereby declared to be subject to regulation in the public interest.* It shall be unlawful for any person to practice or to offer to practice engineering or land surveying in this State, as defined in the provisions of this Chapter, or to use in connection with the person's name or otherwise assume or advertise any title or description tending to convey the impression that the person is either a professional engineer or a professional land surveyor, unless the person has been duly licensed. The right to engage in the practice of engineering or land surveying is a personal right, based on the qualifications of the person as evidenced by the person's certificate of licensure, which shall not be transferable.

(Emphasis supplied). Further, N.C. Gen. Stat. § 89C-3 (2003) defines the "[p]ractice of engineering" as:

> Any service or creative work, the adequate performance of which requires engineering education, training, and experience, in the application of special knowledge of the mathematical, physical, and engineering sciences to such services or creative work as consultation, investigation, evaluation, planning, and design of engineering works and systems, planning the use of land and water, engineering surveys, and the observation of construction for the purposes of assuring compliance with drawings and specifications, including the consultation, investigation, evaluation, planning, and design for either private or public use, in connection with any utilities, structures, buildings, machines, equipment, processes, work systems, projects, and industrial or consumer products or equipment of a mechanical, electrical, hydraulic, pneumatic or thermal nature, *insofar as they involve safeguarding life, health or property, and including such other professional services as may be necessary to the planning, progress and completion of any engineering services.*

(Emphasis supplied). N.C. Gen. Stat. §§ 89C-2, -3 both emphasize "safeguarding life, health, or property[.]" In *Fleming*, this Court expressly rejected the contention that this language created a specific standard of care for professional engineers in this State. 162 N.C. App. at 413, 590 S.E.2d at 872. We hold that N.C. Gen. Stat. §§ 89C-2, -3 are analogous to the "code of ethics for engineers," upon which Dr. Lung solely relied to base his expert opinion.

During Dr. Lung's deposition, the following colloquy took place:

[Mr. Griffin]: And what imposes that duty, Dr. Lung?

[Dr. Lung]: That's [sic] standard of care.

[Mr. Griffin]: Standard of care in North Carolina?

[Dr. Lung]: For average engineers.

[Mr. Griffin]: In what locality? Everywhere?

[Dr. Lung]: I'm using very general—

[Mr. Griffin]: Yes, sir.

[Dr. Lung]: —very general terms.

[Mr. Griffin]: Where does that standard of care come from? If I were an engineer and I said, I want to understand my standard of care along these lines. Where would I go to look it up?

[Dr. Lung]: My earlier statement referred to the code of ethics for professional engineers. That is where it comes from.

[Mr. Griffin]: Does the code of ethics talk about environmental investigations for water lines?

[Dr. Lung]: Not specifically.

[Mr. Griffin]: What does it say?

[Dr. Lung]: *Protecting the public.*

(Emphasis supplied).

It is clear from the record that Dr. Lung based his expert opinion solely on a methodology that has been previously found to be insufficient to establish the standard of care applicable to professional engineers. *See Fleming*, 162 N.C. App. at 413, 590 S.E.2d at 872. We hold plaintiffs have failed to show any abuse of discretion in the trial court's ruling that Dr. Lung's method of proof is not "sufficiently reliable as an area for expert testimony" as is required by *Howerton*. 358 N.C. at 459, 597 S.E.2d at 686.

The trial court was also not convinced that Dr. Lung was qualified to testify as an expert witness regarding the standard of care applicable to the design and administration of underground utility construction projects and entered extensive findings of fact to support this conclusion in its order. Because we affirm the trial court's ruling that Dr. Lung's proffered method of proof is not "sufficiently reliable as an area for expert testimony[,]" review of the second and third factors under *Howerton* is unnecessary. Plaintiffs have failed to show the trial court abused its discretion by granting Arcadis's and the City of Burlington's motion to exclude Dr. Lung's expert testimony regarding the standard of care applicable to professional engineers. This assignment of error is overruled.

## V.  Summary Judgment

Plaintiffs argue the trial court erred by granting summary judgment in favor of Arcadis and the City of Burlington because genuine issues of material fact exist regarding all of plaintiffs' claims.

### A.  Standard of Review

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law. The party moving for summary judgment ultimately has the burden of establishing the lack of any triable issue of fact.

A defendant may show entitlement to summary judgment by (1) proving that an essential element of the plaintiff's case is non-existent, or (2) showing through discovery that the plaintiff cannot produce evidence to support an essential element of his or her claim, or (3) showing that the plaintiff cannot surmount an affirmative defense. Summary judgment is not appropriate where matters of credibility and determining the weight of the evidence exist.

Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial.

We review an order allowing summary judgment *de novo*. If the granting of summary judgment can be sustained on any grounds, it should be affirmed on appeal.

*Wilkins v. Safran*, 185 N.C. App. 668, 672, 649 S.E.2d 658, 661 (2007) (internal citations and quotations omitted).

### B.  Analysis

### 1.  Inherently Dangerous Activities

[3] Plaintiffs argue the Michaels were engaged in an inherently dangerous activity and the City of Burlington breached its non-delegable duty to provide a safe work place, proximately causing the Michaels' deaths. We disagree.

This Court recently reiterated the elements that must be satisfied in order to establish an inherently dangerous activity claim:

First, the activity must be inherently dangerous. Second, at the time of the injury, the employer either knew, or should have known, that the activity was inherently dangerous. Third, the employer failed to take the necessary precautions to control the

attendant risks. And fourth, this failure by the employer proximately caused injury to plaintiff.

*Kinsey v. Spann,* 139 N.C. App. 370, 375, 533 S.E.2d 487, 492 (2000) (internal citations omitted). Under *Kinsey,* we first address whether the Michaels were engaged in an activity that was inherently dangerous. *Id.*

> The rule in regard to 'intrinsically dangerous' work is based upon the unusual danger which inheres in the performance of the contract, and not from the collateral negligence of the contractor. Mere liability to injury is not the test, as injuries may result in any kind of work where it is carelessly done, although with proper care it is not specially hazardous.

*Vogh v. F.C. Geer Co.,* 171 N.C. 672, 676, 88 S.E. 874, 876 (1916). "There is an obvious difference between committing work to a contractor to be executed, from which if properly done, no injurious consequences can arise, and handing over to him work to be done from which mischievous consequences will arise unless preventive measures are adopted." *Woodson v. Rowland,* 329 N.C. 330, 352, 407 S.E.2d 222, 235 (1991) (quoting *Greer v. Construction Co.,* 190 N.C. 632, 637, 130 S.E. 739, 743 (1925)).

Our Supreme Court has previously considered whether "trenching" is an inherently dangerous activity and does so on a case-by-case basis. *See Woodson,* 329 N.C. at 354, 407 S.E.2d at 236. In *Woodson,* the Court conducted an extensive review of the cases involving "trenching" and concluded:

> Courts considering the inherent danger of putting a man in a deep trench have reached conflicting results. Some have held it not to be inherently dangerous, *see, e.g., Cummings v. Hoosier Marine Properties, Inc.,* 173 Ind. App. 372, 363 N.E.2d 1266 (1977), while others have held the question is for the jury. *See, e.g., Smith v. Inter-City Telephone Co.,* 559 S.W.2d 518 (Mo. 1977) (en banc). We think the latter approach is the better reasoned.

*Id.*

Plaintiffs argue that entering into a potable waterline valve vault is analogous to the activity of "trenching" and should be considered an inherently dangerous activity. We disagree.

Here, the Michaels were not engaged in the activity known as "trenching," but entered a secure concrete water vault structure located below ground level to evaluate the cause for a decrease in

waterline pressure. Plaintiffs' own expert witness, David Jackson Hooks ("Hooks"), a supervisor of the construction of underground utilites, stated in his deposition that in the twenty-two years he has worked in construction of underground utilities, "it [was] the first time [he] ever heard of anybody dying in a—anything associated with new construction with water mains[.]" Hooks further stated, "I've heard of it before with sewer mains where the gasses overcame people, but never from water construction." Under the facts of this case, plaintiffs have failed to establish that the Michaels were engaged in an inherently dangerous activity. The trial court properly granted the City of Burlington's motion for summary judgment regarding this particular issue.

### 2.  Violation of Chapter 143

[4] Plaintiffs argue the trial court erred by granting the City of Burlington's motion for summary judgment regarding plaintiffs' claim under Chapter 143. We disagree.

N.C. Gen. Stat. § 143-215.93 (2003) provides:

> Any person having control over oil or other hazardous substances which enters the waters of the State in violation of this Part shall be strictly liable, without regard to fault, for damages to persons or property, public or private, caused by such entry, subject to the exceptions enumerated in G.S. 143-215.83(b).

"Having control" is statutorily defined as "any person, using, transferring, storing, or transporting oil or other hazardous substances immediately prior to a discharge of such oil or other hazardous substances onto the land or into the waters of the State . . . ." N.C. Gen. Stat. § 143-215.77(5) (2003).

Here, the City of Burlington obtained an easement across Huffman's property to construct and maintain a waterline that connected its water system to the City of Greensboro's water system. At no time was the City of Burlington "using, transferring, storing, or transporting oil or other hazardous substances" through its easement. The trial court properly granted the City of Burlington's motion for summary judgment regarding plaintiffs' claim that it violated Chapter 143.

### 3.  Third-Party Beneficiary

[5] Plaintiffs argue the trial court erred by granting summary judgment in favor of the City of Burlington regarding its third-party bene-

ficiary claim. Plaintiffs assert they are direct beneficiaries of the construction contract, in which the City of Burlington assumed liability for all losses and damages relating to hazardous environmental conditions entitling plaintiffs to direct damages. We disagree.

Plaintiffs rely on the following contractual provision between the City of Burlington and Howard as the basis of their claim:

G. To the fullest extent permitted by Laws and Regulations, Owner shall indemnify and hold harmless, CONTRACTOR, Subcontractors, ENGINEER, ENGINEER's Consultants and the officers, directors, <u>shareholders</u>, partners, employees, agents, other consultants, and subcontractors of each and any of them from and against all claims, costs, losses, and damages (including but not limited to all fees and charges of engineers, architects, attorneys, and other professionals and all court or arbitration or other dispute resolution costs) arising out of or relating to a Hazardous Environmental Condition: (i) was not shown or indicated in the Drawings or Specifications or identified in the Contract Documents to be included within the scope of the Work, and (ii) was not created by CONTRACTOR or by anyone for whom CONTRACTOR is responsible. Nothing in this paragraph 4.06.G shall obligate OWNER to indemnify any individual or entity from and against the consequences of that individual's or entity's own negligence.

(Emphasis original).

In order to assert rights under a contract as third-party beneficiaries, plaintiffs must show: "(1) that a contract exists between two persons or entities; (2) that the contract is valid and enforceable; and (3) that the contract was executed for the direct, and not incidental, benefit of the [third party]." *Spaulding v. Honeywell, Int'l, Inc.*, 184 N.C. App. 317, 325, 646 S.E.2d 645, 651 (2007) (quoting *Babb v. Bynum & Murphrey, PLLC*, 182 N.C. App. 750, 753-54, 643 S.E.2d 55, 57-58 (2007)) (alteration original) (emphasis omitted), *cert. denied*, 362 N.C. 177, 657 S.E.2d 667 (2008). When a party seeks enforcement of a contract as a third-party beneficiary, the contract must be construed strictly against the party seeking enforcement. *Id.*

As in the construction of any contract, the court's primary purpose in construing a contract of indemnity is to ascertain and give effect to the intention of the parties, and the ordinary rules of

construction apply. 42 C.J.S. *Indemnity* § 8 (1944). *It will be construed to cover all losses, damages and liabilities which reasonably appear to have been within the contemplation of the parties*, but it cannot be extended to cover any losses '*which are neither expressly within its terms nor of such character that it can reasonably be inferred that they were intended to be within the contract.*'

*Dixie Container Corp. v. Dale*, 273 N.C. 624, 627, 160 S.E.2d 708, 711 (1968) (emphasis supplied).

In *Dixie Container Corp.*, our Supreme Court interpreted a nearly identical indemnity clause and stated:

We think it is reasonably clear that in the "indemnify and save harmless" clause, *defendant only bound itself to reimburse plaintiff for any damages it became obligated to pay third persons as a result of defendant's activity on the leased premises.* Ordinarily, indemnity connotes liability for derivative fault. *Edwards v. Hamill*, 262 N.C. 528, 138 S.E.2d 151. "In indemnity contracts the engagement is to make good and save another harmless from loss on some obligation which he has incurred or is about to incur to a third party. . . ." *Casualty Co. v. Waller*, 233 N.C. 536, 537, 64 S.E. 2d 826, 827.

*Id.* at 628, 160 S.E.2d at 711 (emphasis supplied). Further, Black's Law Dictionary defines the term "indemnify" as "[t]o reimburse (another) for a loss suffered because of a third party's or one's own act or default." *Black's Law Dictionary* 783-84 (8th ed. 2004).

The City of Burlington contractually bound itself to *reimburse* the Michaels for "all claims, costs, losses, and damages . . . arising out of or relating to a Hazardous Environmental Condition[.]" Plaintiffs have not become obligated to pay damages to a third party as a result of the Michaels' activity at the construction site. It is clear that plaintiffs are not seeking to be indemnified, but are attempting to collect payment of direct damages for personal injury. Plaintiffs seek to recover damages "which are neither expressly within its terms nor of such character that it can reasonably be inferred that they were intended to be within the contract." *Dixie Container Corp.*, 273 N.C. at 627, 160 S.E.2d at 711. The trial court properly ruled that plaintiffs are not entitled to recover direct damages based upon the indemnity language in the contract.

**MICHAEL v. HUFFMAN OIL CO.**

[190 N.C. App. 256 (2008)]

## 4. Negligence Claims

Plaintiffs argue the trial court erred by granting summary judgment in favor of Arcadis and the City of Burlington regarding their negligence claims. Plaintiffs assert the following claims against both Arcadis and the City of Burlington: (1) negligence based upon the failure to warn and the failure to investigate and (2) negligent misrepresentation. Plaintiffs also assert the City of Burlington is liable under a negligence theory of premises liability.

### i. Professional Negligence

[6] In order to establish a claim of professional negligence, a plaintiff must show: "(1) the nature of the defendant's profession; (2) *the defendant's duty to conform to a certain standard of conduct*; and (3) a breach of the duty proximately caused injury to the plaintiffs." *Fleming*, 162 N.C. App. at 413, 590 S.E.2d at 872 (quoting *Greene v. Pell & Pell, L.L.P.*, 144 N.C. App. 602, 604, 550 S.E.2d 522, 523 (2001)) (emphasis supplied).

> The standard of care provides a template against which the finder of fact may measure the actual conduct of the professional. The purpose of introducing evidence as to the standard of care in a professional negligence lawsuit "is to see if this defendant's actions 'lived up' to that standard . . . ." *Little v. Matthewson*, 114 N.C. App. 562, 567, 442 S.E.2d 567, 570 (1994), *aff'd per curiam*, 340 N.C. 102, 455 S.E.2d 160 (1995). Ordinarily, expert testimony is required to establish the standard of care. *Bailey v. Jones*, 112 N.C. App. 380, 387, 435 S.E.2d 787, 792 (1993).

*Id.* at 410, 590 S.E.2d 870. *But see Handex of the Carolinas, Inc. v. County of Haywood*, 168 N.C. App. 1, 11, 607 S.E.2d 25, 31 (2005) (citation and quotation omitted) ("The only exception to the requirement of establishing the professional standard of care by way of expert testimony is where the common knowledge and experience of the jury is sufficient to evaluate compliance with a standard of care[.]").

Because we have previously held that the trial court properly excluded Dr. Lung's expert testimony regarding the standard of care applicable to Arcadis and the City of Burlington, plaintiffs are unable to establish a *prima facie* showing of professional negligence. *Fleming*, 162 N.C. App. at 413, 590 S.E.2d at 872. The trial court properly granted summary judgment in favor of Arcadis and the City of Burlington regarding plaintiffs' professional negligence claims.

### ii. Negligent Misrepresentation

**[7]** North Carolina has "adopted the Restatement 2d definition of negligent misrepresentation and [our courts have] held that the action lies where *pecuniary loss* results from the supplying of false information to others for the purpose of guiding them in their business transactions." *Driver v. Burlington Aviation, Inc.*, 110 N.C. App. 519, 525, 430 S.E.2d 476, 480 (1993) (citations omitted) (emphasis original). In *Driver*, this Court further stated, "we have not found, and plaintiffs have not directed us to, any case in which the theory of negligent misrepresentation was approved as a basis for recovery for personal injury." *Id.* at 525, 430 S.E.2d at 481.

Plaintiffs attempt to side-step this precedent by stating in their brief, "[a]ppellants' use of the term 'Negligent Misrepresentation' does not subject their claim to dismissal. Regardless of how the claim is labeled, [a]ppellants state a claim based upon traditional negligence rules." As stated above, without evidence of the applicable standard of care, plaintiffs have failed to establish a *prima facie* claim for professional negligence. Plaintiffs' contentions have no merit and are overruled.

### iii. Premises Liability

**[8]** In *Nelson v. Freeland*, our Supreme Court articulated a consolidated approach to premises liability in North Carolina and abolished the distinction between invitees and licensees by "requiring a standard of reasonable care toward all lawful visitors." 349 N.C. 615, 631, 507 S.E.2d 882, 892 (1998). In *Royal v. Armstrong*, this Court applied this reasoning in *Nelson* and stated:

> [T]he substitution of a 'reasonable care' standard for earlier distinctions between the duties a host owed to invitees and to licensees in determining premises liability *does not mean that summary judgment is inappropriate where, as a matter of law,* "*there are no genuine issues of material fact and the plaintiff fails to show one of the elements of negligence.*"

136 N.C. App. 465, 469, 524 S.E.2d 600, 602 (quoting *Lavelle v. Schultz*, 120 N.C. App. 857, 859, 463 S.E.2d 567, 569 (1995)), *disc. rev. denied*, 351 N.C. 474, 543 S.E.2d 495 (2000).

Here, based upon the complexity of the facts before us, expert testimony is required to establish the standard of care applicable to the City of Burlington. *Fleming*, 162 N.C. App. at 410, 590 S.E.2d at

870; *see also Handex*, 168 N.C. App. at 11, 607 S.E.2d at 31 ("Implicit in the expert's establishment of the professional standard of care as the baseline for the jury, is that by way of establishing that standard the expert can assist the jury in discerning whether defendant's professional performance or conduct did not conform therewith, and thus was in breach of that duty and the proximate cause of plaintiff's injury."). This is not a case "where the common knowledge and experience of the jury is sufficient to evaluate compliance with a standard of care[.]" *Handex*, 168 N.C. App. at 11, 607 S.E.2d at 31. As held above, plaintiffs failed to present any expert testimony regarding the standard of care applicable to the City of Burlington.

Plaintiffs failed to show any genuine issues of material fact exist regarding any of the claims asserted against these defendants. The trial court properly granted summary judgment in favor of Arcadis and the City of Burlington. This assignment of error is overruled.

## VI. Conclusion

Dr. Lung solely relied upon a code of ethics for engineers as the basis of his proffered expert testimony. Dr. Lung's methodology was insufficient to establish the standard of care applicable to professional engineers and was not "sufficiently reliable as an area for expert testimony[.]" *Howerton*, 358 N.C. at 459, 597 S.E.2d at 686. Plaintiffs have failed to show the trial court abused its discretion by granting Arcadis's and the City of Burlington's motions to exclude Dr. Lung's expert testimony.

Viewed in the light most favorable to plaintiffs, no genuine issues of material fact exist regarding any of plaintiffs' claims against Arcadis and the City of Burlington. The trial court's orders are affirmed.

Affirmed.

Judges McGEE and STEPHENS concur.